KENNETH E. KELLER (SBN 71450)
TRACY M. CLEMENTS (SBN 184150)
MICHAEL D. LISI (SBN 196974)
KRIEG, KELLER, SLOAN, REILLEY & ROMAN LLP
555 Montgomery Street, 17th Floor
San Francisco, CA  94111
Telephone:     (415) 249-8330
Facsimile:      (415) 249-8333

Attorneys for Plaintiff
NEUROREPAIR, INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEUROREPAIR, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE NATH LAW GROUP, a Professional Limited Liability Corporation, ROBERT P. COGAN, an individual, and Does 1-20, <br><br> Defendants. | Case No.:  09 CV 986 JAH (WMc) <br><br> **PLAINTIFF NEUROREPAIR, INC.'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT RE DEFENDANTS' LIABILITY FOR MALPRACTICE AND BREACH OF FIDUCIARY DUTY;** <br><br> **NOTICE OF MOTION AND MOTION TO STRIKE DEFENDANTS' AFFIRMATIVE DEFENSES WITH PREJUDICE; AND** <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> **Date:**          January 24, 2011 <br> **Time:**          2:30 p.m. <br> **Judge:**         The Hon. John A. Houston <br> **Courtroom:**  11 <br><br> **Complaint Filed:**     March 20, 2009 |

# NOTICE

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on January 24, 2011 at 2:30 p.m., or as soon thereafter as counsel may be heard in the above-entitled Court, located at 940 Front Street San Diego, CA 92101-8900, Plaintiff Neurorepair, Inc. ("Neurorepair") will and hereby does move for an order granting summary adjudication on the issue of liability in Plaintiff's favor and for an order striking Defendants' affirmative defenses with prejudice.

These motions are made pursuant to Fed.R.Civ.P. 56 and 12 and are based upon this Notice of Motion; the accompanying Memorandum of Points and Authorities; the accompanying Request for Judicial Notice; the accompanying Declarations of Matthew Klipstein and Tracy Clements; the pleadings and papers on file herein; and upon such other matters as may be presented to the Court at the time of the hearing.

# TABLE OF CONTENTS

Page No.

MOTION FOR SUMMARY ADJUDICATION.................................................................. 1

I.       PRELIMINARY STATEMENT ...................................................................... 1

II.      LEGAL STANDARD....................................................................................... 2

III.     FACTUAL BACKGROUND ........................................................................... 3

         A.       Neurorepair and the Patented Technology...................................... 3

         B.       Defendants' Malpractice and Breach of Fiduciary Duty ............... 5

IV.      ARGUMENT ................................................................................................. 10

         A.       The Undisputed Facts Demonstrate That Defendants Are Liable for Legal
                  Malpractice .................................................................................. 10

         B.       The Undisputed Facts Demonstrate That Defendants Are Liable for
                  Breach of Fiduciary Duty ............................................................. 15

         C.       The Undisputed Facts Demonstrate That Defendants' Malpractice and
                  Breach of Fiduciary Duty Caused Plaintiff To Suffer Damage ............ 17

MOTION TO STRIKE AFFIRMATIVE DEFENSES WITH PREJUDICE .................... 19

I.       PRELIMINARY STATEMENT ................................................................... 19

II.      FACTUAL BACKGROUND ........................................................................ 19

III.     ARGUMENT ................................................................................................. 21

         A.       Defendants' Affirmative Defenses Violate Fed.R.Civ.P. 8 And Should Be
                  Stricken with Prejudice ................................................................ 21

         B.       Justice Requires That the Affirmative Defenses be Stricken With
                  Prejudice ...................................................................................... 24

IV.      CONCLUSION.............................................................................................. 25

i

# TABLE OF AUTHORITIES

Page No.

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)............................................................................................ 2

*Ariosta v. Fallbrook Union High School Dist.*,
    2009 WL 1604569, at *8 (S.D. Cal.) ................................................................ 24

*Ashcroft v. Iqbal*,
    129 S.Ct. 1937 (2009)................................................................................. 22, 23

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).......................................................................................... 22

*Black v. Sullivan*,
    48 Cal.App.3d 557 (1975) ................................................................................ 10

*CTF Dev., Inc. v. Penta Hospitality*,
    2009 WL 3517617, at *7-8 (N.D. Cal.) ........................................................... 22

*David Welch Co. v. Erskine & Tulley*,
    203 Cal.App.3d 884 (1988) .............................................................................. 16

*Ferguson v. Lieff, Cabraser, Hiemann & Bernstein, LLP*,
    30 Cal.4th 1037 (2003) .................................................................................... 11

*Glover* v. *Elliott*,
    2007 WL 2904050 (W.D. Mich)...................................................................... 25

*Hayes v. Agilysys*,
    2009 WL 891832, at *1 (N. D. Ill.) ............................................................ 23, 25

*Heller Fin., Inc.* v. *Midwhey Powder Co.*, Inc.,
    883 F.2d 1286 (7th Cir. 1989) .................................................................... 22, 23

*In re Schulze*,
    346 F.2d 600, 602, 145 USPQ 716, 718 (CCPA 1965) ................................... 14

*Jones v. Community Redevelopment Agency*,
    733 F.2d 646 (9th Cir. 1984) ........................................................................... 23

*Litton Sys., Inc. v. Whirlpool Corp.*,
    728 F.2d 1423 (Fed. Cir. 1984) ....................................................................... 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................................ 2

*Mirabito v. Liccardo*,
    4 Cal.App.4th 41 (1992) ................................................................................... 16

ii

*Molins PLC v. Textron, Inc.*,
   48 F.3d 1172 (Fed. Cir. 1995) ................................................................ 13

*Mosier v. Southern California Physicians Ins. Exch.*,
   63 Cal.App.4th 1022 (1998) ................................................................ 16

*Palmer v. Oakdale Farms, Inc.*,
   2010 WL 2605179, at *4 (W.D. Va.) ................................................................ 22

*Qarbon.com, Inc. v. eHelp Corp.*,
   315 F.Supp.2d 1046 (N.D. Cal. 2004) ................................................................ 23, 25

*Reis Robotics USA, Inc. v. Concept Indus., Inc.*,
   462 F.Supp.2d 897 (N.D. Ill. 2006) ................................................................ 24

*Servpro Industries, Inc. v. Schmidt*,
   905 F. Supp. 475 (N.D. Ill. 1995) ................................................................ 24

*Shechter* v. *Comptroller Of City Of New York*,
   79 F.3d 265 (2nd Cir. 1996) ................................................................ 24

*Sidney-Vinstein v. A.H. Robins Co.*,
   697 F.2d 880 (9th Cir. 1993) ................................................................ 25

*Slovensky v. Friedman*,
   142 Cal.App.4th 1518 (2006) ................................................................ 16

*Spector v. Mermelstein*,
   485 F.2d 474 (2d Cir. 1973) ................................................................ 17

*Stanley v. Richmond*,
   35 Cal.App.4th 1070 (1995) ................................................................ 16

*Woodfield* v. *Bowman*,
   193 F.3d 354 (5th Cir. 1999) ................................................................ 22

*Woodfield v. Nationwide Mutual Ins. Co.*,
   193 F.3d 354 (5th Cir. 1999) ................................................................ 24

*Wright v. Williams*,
   47 Cal.App.3d 802 (1975) ................................................................ 11

*Wyshak v. City Nat'l Bank*,
   607 F.2d 824 (9th Cir. 1979) ................................................................ 23, 26

**Statutes**

35 U.S.C. § 102 ................................................................ 12, 13

35 U.S.C. § 103(a) ................................................................ 13, 15

35 U.S.C. § 154 ................................................................ 19

Cal. Corp. Code § 16306(a) ................................................................ 10

**Other Authorities**

2 Mallen & Smith, Legal Malpractice § 14:2, p. 586-87 (2007 ed.) ................................................................ 16

iii

MPEP § 716 ................................................................................................................... 1, 7, 14

MPEP§ 716.01(c)(II) .................................................................................................... 14

Unif. Partnership Act 1997 § 306(a) ........................................................................... 10

**Rules**

35 C.F.R. 1.132 ............................................................................................................ 15

37 C.F.R. 1.132 ...................................................................................................... 14, 15

Cal. Rules of Prof. Conduct  3-110 ............................................................................. 16

CRCP 3-110 ................................................................................................................. 17

CRCP 3-500 ................................................................................................................. 17

CRCP 3-550 ................................................................................................................. 16

Fed.R.Civ.P. 15 ........................................................................................................... 24

Fed.R.Civ.P. 56(c)(2) .................................................................................................... 2

Fed.R.Civ.P. 56(e)(2) .................................................................................................... 2

Fed.R.Civ.P. 8 ............................................................................................................. 22

Fed.R.Civ.P. 8(b)(1) and (2) ....................................................................................... 22

Fed.R.Civ.P. 8(c) ........................................................................................................ 22

Federal Rule of Civil Procedure 56(a) .......................................................................... 2

Federal Rule of Civil Procedure Rule 56(d) ................................................................. 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY ADJUDICATION & MOTION TO STRIKE
Case No.:  09 CV 986 JAH (WMc)

## MOTION FOR SUMMARY ADJUDICATION

### I.      PRELIMINARY STATEMENT

This is an action for legal malpractice, breach of fiduciary duty, fraud and other related causes of action arising out of Defendants' misconduct in handling Plaintiff Neurorepair, Inc.'s patent applications, and their fraud and concealment of that misconduct.

Although more than ample evidence and legal authority exist to demonstrate the malpractice and causation of damages alleged, Defendant Nath Law Group's own internal documents are sufficient to prove the incompetence, malpractice, and breach of fiduciary duty of its former employee, Defendant Robert Cogan.  (*See* Clements Decl., Exh. A.)

Furthermore, to date, Defendants' defense has relied exclusively on the "theory" that Plaintiff cannot obtain patents on the technology at issue.  However, this theory was obviated on July 22 and 26, 2010, when the United States Patent and Trademark Office ("PTO") issued notices of allowance on two of Plaintiff's applications, which issued as patents on September 7 and 14, 2010.  (Request for Judicial Notice ("RJN") 1-4.)

The public record of the PTO itself establishes the malpractice of Defendants and the damages caused to Neurorepair by delay in obtaining these patents.  The notices of allowance are clear that the filing of an inventor's declaration by Neurorepair's current patent counsel traversed the Examiner's objection and caused the patents to be allowed a mere two months later.  (RJN 1-2.) Regrettably, Defendants never submitted such a declaration – a clear breach of the standard of care. (*See* Smegal Supplemental Expert Report, ¶¶ 13-15 and RJN 5, 6 [Fallon PTO Decl.]; RJN 10, MPEP § 716, *et seq*.)[1]  Had they done so, Neurorepair would have obtained these patents at least four years ago, and it would have avoided millions of dollars of damages caused by Defendants' malpractice.  (*See* Burns Supplemental Expert Report, ¶¶ IV, VIII.)

Thus, the undisputed facts compel summary adjudication in favor of Plaintiff on the malpractice and breach of fiduciary duty causes of action, with the only issue to be tried on those

---

[1]  The various expert reports cited in this memorandum are attached as Exhibits H-M to the Declaration of Tracy Clements.

claims being the exact amount of damage.

## II.      LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that "[a] party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of the claim." In addition, Rule 56(d) provides:

> (d) **Case Not Fully Adjudicated on the Motion.**
>
> (1) Establishing Facts.
>
> If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue. The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys. It should then issue an order specifying what facts — including items of damages or other relief — are not genuinely at issue. The facts so specified must be treated as established in the action.
>
> (2) Establishing Liability.
>
> An interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages.

Fed.R.Civ.P. 56(d). Thus, even if there are disputed facts regarding the *amount* of damage, summary adjudication on the issue of liability and the *fact* of damage is appropriate.

Summary adjudication is appropriate when the movant demonstrates that the pleadings, depositions, affidavits, and other evidence available to the court establish that there is no genuine issue of material fact. Fed.R.Civ.P. 56(c)(2). Once the movant has met this burden, the respondent must demonstrate that there are fact issues requiring a trial. Fed.R.Civ.P. 56(e)(2). In opposing summary judgment, the respondent may not rely on conclusory allegations in his pleadings; rather, he must set forth sufficient admissible evidence supporting a claimed factual dispute such that a fact finder is required to resolve the parties' differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).

There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt as to the material facts").

2

### III.   FACTUAL BACKGROUND

#### A.   Neurorepair and the Patented Technology

Plaintiff Neurorepair, Inc. ("Neurorepair" or "Plaintiff") was founded by Matthew Klipstein after he suffered a devastating neurological injury resulting from an accident in an athletic competition.  (Klipstein Decl., ¶ 2.)  Mr. Klipstein, who was at the time a relatively young and accomplished athlete and a successful entrepreneur, was rendered permanently disabled (specifically, he is hemiplegic – the entire left side of his body was, and remains, paralyzed).  (*Id.*)  Following the accident, Mr. Klipstein spent months in hospitals.  During that time he was repeatedly advised by his doctors that "brain injuries never heal; there is no treatment; you will never recover." (*Id.*)

It is a bedrock precept of medicine that once neurons are lost they never heal, nor are they replaced, and that it is simply not possible to treat the damage in any effective way.  Mr. Klipstein's neurologists advised him that it was "impossible" to replace dead neurons.  (*Id.* at ¶ 2.)  Frustrated with what he viewed as a defeatist and unscientific attitude, Mr. Klipstein resolved to create a company or foundation for the purpose of achieving what his doctors had assured him was not possible — to find a way to repair his brain injury.  (*Id.* at ¶ 3.)

In his search to find some way to cure his own injury, Mr. Klipstein learned that very little work to find a method to repair damage to the Central Nervous System ("CNS") was being conducted anywhere in the world.  (Klipstein Decl., ¶ 4.)  Then, he discovered a dissenting scientist, Dr. James H. Fallon, a Professor of Neuroanatomy and Neurobiology at the University of California, Irvine, School of Medicine.  (*Id.*)  Dr. Fallon had discovered in 2000 that a naturally-occurring, endogenous, protein called Transforming Growth Factor–alpha ("TGF-a"), has remarkable neurotrophic and mitogenic effects.  That is, when administered to an injured brain, TGF-a stimulates a massive proliferation of adult pluripotent stem cells in the brain; these cells migrate from their place of origin near the striatum, to the locus of damage, and then differentiate into the kinds of cells that have been damaged or destroyed.  (*See* Klipstein Decl., ¶ 5 and Exh. A [*Proceedings of the National Academy of Sciences*, December 19, 2000].)

Dr. Fallon's discoveries were acknowledged as revolutionary, and were presented to

3

Congress.  (Klipstein Decl., ¶ 6.)  However, for lack of funding, they had not been developed beyond the initial discoveries made in 2000.  (*Id.*)  The University of California required that further work on Dr. Fallon's historic invention be funded by a sponsor and insisted that the sponsor be a corporation.  The University refused even to consider an individual sponsor.  (*Id.*)

While the University did file and begin to prosecute three Patent Applications based on Fallon's groundbreaking work (the "Fallon Applications"), the Regents subsequently agreed to convey ownership of all of the intellectual property connected with the Fallon Applications to Neurorepair.  (*Id.* at ¶ 7.)

The importance of the intellectual property that is at the heart of this case cannot be overstated. Because the human brain is so complex, the doctrine of medical science has long been that the only possible hope of repairing neurological damage is "neurogenesis" -- the stimulation of the brain's endogenous adult neural stem cells by which the brain might heal itself.  (*See* Fallon Expert Report dated 4/8/10, § 11.)  However, medical science has also long held that neurogenesis, while evident in developing embryonic and very young brains, does not exist in the adult human brain.  Thus, adult brain injury, according to dogma, has always been thought hopeless.  (*Id.*)

Working together, Neurorepair, Dr. Fallon, and his team at UCI have proven this dogma wrong.  Beginning in 2005, with Neurorepair's financial assistance, Dr. Fallon was able to conduct the experiments necessary to make a stunning scientific breakthrough verifying that restorative neurogenesis can be stimulated in the adult mammalian brain.  (*See* Fallon Expert Report dated 4/8/10, § 22; Clements Decl., Exh. P [May 2009 *Neuroscience*] and Exh. Q [January 2010 *Journal of Stroke and Cerebrovascular Diseases*].)

Because Fallon's invention is not disease-specific, but triggers the brain's own latent ability to repair itself, this technology is expected to be effective in treating virtually every kind of brain injury and disease.  (*See* Fallon Expert Report dated 4/8/10, § 26.)  In addition to the ineffable importance of this Invention to the millions of people who suffer from brain injury and disease, and to their families, this technology could well prove to be the single most important answer to the problem of health care costs in America and around the world.  Stroke is the leading cause of long-term disability in the United States, where there are approximately 700,000 strokes each year and

4

presently nearly five million disabled stroke survivors.  (Burns Expert Report dated 4/9/10, page 7.)
In the U.S. alone, treatment of the lasting symptoms of stroke costs approximately $75 billion a year.
(*Id.*)  World-wide, the cost of Stroke, in direct medical costs, long-term care, life-long medication,
and lost productivity, are several times that amount.  (*See* Clements Decl., Exh. P [May 2009
*Neuroscience*] and Exh. R [August 2010 *Neurotrauma*].)

Traumatic Brain Injury ("TBI") has recently been recognized by the Department of Defense
as a serious, debilitating, injury, prompting the creation of the Combat Casualty Care Traumatic
Brain Injury Research Program, and also by Congress through its recently formed Congressional
Brain Injury Task Force.  Further, TBI has recently been recognized as a chronic disease and a
national epidemic in America.  (*See* Clements Decl., Exh. R [August 2010 *Neurotrauma*].)  Recent
discoveries have prompted the NFL to engage in a formal study of TBI, and Congress to pass
legislation to protect high school athletes from TBI.  (*See* Clements Decl., Exh. T [Homepage of
Congressman Bill Pascrell: http://pascrell.house.gov/list/press/nj08_pascrell/pr12042009.shtml].)

Adding the cumulative costs of stroke, TBI, Parkinson's, multiple sclerosis, Alzheimer's
Disease, cerebrovascular dementia, and the many other less common central nervous system
("CNS") disorders, such as ALS and Huntington's, the world-wide costs may be almost incalculable.
In the U.S. alone the costs of brain injury and disease likely exceeds several hundred billion dollars
per year.  (*See* Clements Decl., Exh. S [Oxford University Press, *Journal of Age & Ageing*,
December, 2009].)  These horrific human and economic costs could be substantially reduced, if not
eliminated, by Neurorepair's invention.

### B.   Defendants' Malpractice and Breach of Fiduciary Duty

The Nath Law Group is a patent law firm, of a business form unknown to Plaintiff.
Defendants claim in their pleadings that the Nath Law Group is a "Limited Liability Corporation,"
but it would appear in reality to be a sole proprietorship owned by Gary Nath with no other real
partners.  At all times relevant hereto, the Nath Law Group purported to have a home office in
Alexandria Virginia, and one satellite office in San Diego, California composed of Robert Cogan
and the Managing Partner of the office, Ross Epstein.  (Clements Decl., Exhs. C & D.)

Defendant Robert Cogan is a patent lawyer, formerly employed by the Nath Law Group,

1   whom Mr. Klipstein met approximately concurrently with the events alleged herein.  Cogan held

2   himself out as, and was shown on the Nath website and on his business card as, a "Partner" in the

3   firm.  (Klipstein Decl. at ¶ 8 and Exh. B; Clements Decl., Exh. C.)  Unbeknownst to Klipstein,

4   Cogan was, in reality, no more than a contract employee of the firm whose compensation was

5   merely a portion of whatever was billed and collected from the clients he worked for.  (Clements

6   Decl., Exh. F [Nath Depo. at 8:13-20, 18:10-19:16, 22:5-23:17].)  Thus, he had a decided incentive

7   to overbill Neurorepair, his only client of substance, which he did.

8          When Mr. Klipstein discussed with Mr. Cogan the possibility of Defendants representing

9   Neurorepair in the prosecution of the Patent Applications Neurorepair had acquired from the

10  University of California, Cogan made several false, fraudulent, and intentionally misleading

11  statements, all intended to induce Klipstein to retain Cogan and Nath to represent Neurorepair.[2]

12  Cogan represented to Klipstein that both he and the Nath Law Firm were exceptionally well-

13  qualified to prosecute the complex biotechnology Patent Applications.  (Klipstein Decl., ¶ 9.)  Cogan

14  represented to Mr. Klipstein that he was thoroughly experienced as a patent prosecutor and litigator,

15  and that he possessed the particular skill necessary to successfully represent Neurorepair before the

16  PTO.  (Id..)  Cogan further represented that, while his background was not in any form of life

17  science, in his professional opinion, a life sciences background was not required to successfully

18  prosecute the Fallon Applications.  (Id. at ¶ 10.)  Instead, Cogan asserted that the necessary skill to

19  obtain Patents from the then-pending Applications was an understanding of how the Patent Office

20  works and an ability to "emphasize with examiners rather than insult them," which, he claimed, had

21  worked for him before and would work again.  (Id., Exh. C.)  Finally, Cogan assured Klipstein that

22  should the prosecutions require knowledge of any life science, the Nath firm had several partners,

23  including the firm's founder, Gary Nath, who were well-versed in those disciplines.  (Klipstein

24  _____

25  [2]  While Defendants have recently claimed that the Nath Law Group took over the prosecution of
    only one of the three related TGF-a Patent Applications, all three Application prosecutions were in
    fact assigned to the Nath Law Group in June, 2006.  (See RJN 7-9 [Powers of Attorney prepared by
26  Cogan dated June 2, 2006] and Klipstein Decl., Exh. D [email dated 12/4/05 from Cogan to
    Klipstein acknowledging receipt of all three files from the University's patent counsel]; Exh. E
27  [email dated 1/6/06 from Cogan to Klipstein stating he is preparing powers of attorney and that "we
    may wish to coordinate all three cases"].)

28

6

Decl., ¶ 10.)  In reality:

> • Cogan, whose degree is in Electrical Engineering, was completely unqualified to handle the Patent Applications and failed utterly in his "efforts" to obtain Neurorepair's Patents.  (Smegal Expert Report, dated 4/7/10, § IV. A; Clements Decl., Exh. A.)

> • Cogan never brought any qualified member of the firm, if there was one, in to substantively assist him with the Patent prosecutions.  In fact, the firm's billing records show that Cogan billed 88 percent of the fees charged to Neurorepair on the patent application matters.  (Clements Decl., ¶8 and Exh. G.)

> • While Cogan represented that he would enlist the assistance of Susanne Hopkins, then an associate who, Cogan claimed, had a "PhD in biology" (Klipstein Decl. at ¶ 10), Ms. Hopkins:  (1) has no PhD in anything; she has a Bachelors Degree in Biology from the State University of New York at Buffalo (Clements Decl., Exh. E [Hopkins profile]); and (2) Ms. Hopkins billed a combined total of 83 hours in the three Neurorepair Patent Application matters (as compared to Cogan's 640 hours). (Clements Decl., ¶ 8 and Exh. G.)

Defendants' misrepresentations were material because knowledge and appreciation of the innovative work of Dr. Fallon was critical to obtaining the patents.  (*See* Smegal Supplemental Expert Report, ¶ 13-15; RJN 10 [MPEP § 716, *et seq.*]; RJN 1-2 [Notices of Allowance].)  Critically, Cogan never substantively interviewed Dr. Fallon nor did he ever review all of Dr. Fallon's laboratory records.  (Klipstein Decl., ¶ 21; Smegal Supplemental Expert Report, ¶ 13-15.)  Cogan never understood or reported to the Examiner that Dr. Fallon had actually tried the techniques of the prior art cited by the Examiner in the rejections (primarily the "Weiss Patent," U.S. Pat No. 5,980,885) and that the techniques of the prior art were ineffective.  (Smegal Supplemental Expert Report at ¶ 13-15; RJN 5, 6 [Fallon PTO Decl.].)  Cogan never understood or reported to the Examiner that Dr. Fallon had actual laboratory data demonstrating the unexpected and startling results of the use of TGF-a.  (*Id.*; Klipstein Decl., ¶¶ 20-21.)

When Defendants took over the prosecution of all three of the Patent Applications, the applications had been rejected as "obvious" in light of the Weiss Patent.  (*See* RJN 1-2.)  Any patent prosecutor exercising the requisite skill in the art would have interviewed the inventor and submitted a declaration from him or an expert in the field to demonstrate the unexpected results of the inventions and the failures of the prior art.  (Smegal Supplemental Expert Report at ¶¶ 13-15.)

Defendants took over Plaintiff's applications and "prosecuted" them until September 2007,

billing more than $200,000 in legal fees and expenses, which Plaintiff paid.  (Klipstein Decl., ¶ 12 and Exh. F; Clements Decl., Exh. G.)  However at no time did Cogan submit the critical declaration to the PTO, which subsequent events have shown would have resulted in the immediate allowance of the patent applications.  (Klipstein Decl., ¶ 20-21; RJN 1-2 [Notices of Allowance].)  Nor did Cogan ever advise Neurorepair of the need for such a declaration.  (Klipstein Decl., ¶ 13.)  To the contrary, during his representation of Plaintiff, Cogan repeatedly assured Plaintiff that he *would* obtain the patents.  (*Id.*)  He represented that Neurorepair's Intellectual Property was "patentable," that there was no need for "reassurances," and that he "really and truly believe[d] the patent application [would] be allowed."  (*Id.* at Exhs. G, H, I.)

Defendants also failed to advise Plaintiff of Cogan's incompetence in handling the patent applications.  (Klipstein Decl., at ¶ 15.)  Critically, Defendant Nath Law Group deliberately concealed from Plaintiff its own internal investigation of Cogan and its conclusion that he had mishandled the Neurorepair applications and had overbilled Neurorepair, which had spent a significant amount of money with the firm with "nothing to show for it."  (*See* Clements Decl., Exhs. A & B.)  On July 25, 2007, Ross Epstein, the managing partner of the Nath Law Group's San Diego office sent an honest, yet scathing, email to Cogan.  Epstein stated:

> At this point, you need to go back to the client and revise your estimate to be in line with what Sue has provided to you.  We do not understand where you got $50,000 and why you would provide such information to a client who has already spent more than $100,000 with us and has nothing to show for it.  You then must, and I mean MUST, let him know that you cannot work any more on this matter and that Sue will be taking it over with your MINIMUM support.  Enough is enough.  This handoff should have happened months ago.  I do not understand why it has still not.  If this doesn't happen next week, I will be forced to contact Matthew myself.  Please do not make this necessary.

(Clements Decl., Exh. A.)  However, Defendants never revealed these problems to Plaintiff.  Instead, they deliberately concealed Cogan's malpractice and their overbilling.  (Klipstein Decl. at ¶ 15.)

On August 22, 2007, Neurorepair decided to replace Defendants with new counsel as to the Fallon Patent Applications.  (Klipstein Decl., ¶ 16 & Exh. L.)  However, Neurorepair did not terminate its relationship with Defendants, who were still prosecuting another application for the so-called Klipstein Equilibrium Patent (although they misrepresented and ultimately defrauded Plaintiff with respect to that application as well).  (*Id.*; RJN 11 [7/21/09 notice of abandonment].)

8

Eventually, Neurorepair hired attorney James Haley of Ropes & Gray to take over the Fallon Patent prosecutions.  (Klipstein Decl., ¶ 19.)  Haley immediately recognized what Cogan never did – that evidence, not argument, had to be presented to the Examiner in order to overcome her objections.  (Smegal Supplemental Expert Report, ¶ 13-15.)  Therefore, on May 11, 2010, Haley submitted a declaration from Dr. Fallon regarding the success of his work and the failures of the prior art.  (Klipstein Decl., ¶ 20 and Exhs. N, O; RJN 5, 6.)  Two months later, the exact same examiner who was handling these applications while they were being prosecuted by Defendants issued Notices of Allowances, in which she recognized the significance of the Fallon Declaration:

> The [Fallon] declaration under 37 CFR 1.132 filed 5/11/22 is sufficient to overcome the rejection under 35 U.S.C. 103(a) as being unpatentable over Weiss et al., . . . based on the unexpected results.  In particular, the declaration filed on 5/11/10 showed that intrastriatal administration of TGF-a in lesioned animals (6-OHDA model) lead to massive cellular proliferation and mass migration of cells and ameliorating the effects of the lesion (improvement of rational behavior) as compared to intracerebroventricular administration of TGF-a or other growth factors or combinations of growth factors shown in the reference of Weiss et al.

(RJN 1 - 2.)

Two months later, the patents issued.  (RJN 3 - 4.)  Tragically, as a result of Defendants' malpractice, Neurorepair lost at least four years of additional years of patent coverage, which is crucial to Neurorepair's ability to commercialize this technology and to "bring it to market."  (*See* Lynch Expert Report, ¶ IV(3)(a).)

In February 2009, while having its patent files reviewed by another law firm, Neurorepair discovered for the first time that Defendants were guilty of malpractice, breach of contract, and fraud.  (Klipstein Decl., ¶ 17.)  On March 21, 2009, Neurorepair filed a Complaint alleging these and other related causes of action against the Nath Law Group and Cogan (who was by then no longer with the Nath firm) in California Superior Court.  Defendants, without objection from Plaintiff, timely removed the case to this Court pursuant to 28 U.S.C § 1295.  It was not until Defendants produced a copy of a July 25, 2007 email from Epstein to Cogan in discovery in this action that I learned that the Nath Law Group had serious concerns about either Cogan's competence or his motivations.  (*Id.* at ¶ 15.)

## IV.    ARGUMENT

As demonstrated by the undisputed material facts set forth above, both Defendants are liable to Neurorepair for legal malpractice and breach of fiduciary duty.  In addition to its own misconduct, by virtue of having held Cogan out as a "partner" in the firm, as well as by the actions of other members of the firm, Defendant Nath Law Group is liable for the same causes of action and to the same extent as Defendant Cogan.  "[A]ll partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law."  Cal. Corp. Code § 16306(a); Unif. Partnership Act 1997 § 306(a); *Black v. Sullivan*, 48 Cal.App.3d 557, 569 (1975) ("the Law Firm is properly joined as a defendant because the partners of a partnership are jointly and severally liable for the conduct and torts injuring a third party committed by one of the partners").

### A.    The Undisputed Facts Demonstrate That Defendants Are Liable for Legal Malpractice

The Judicial Council of California Civil Jury Instructions provide, in relevant part:

601. Damages for Negligent Handling of Legal Matter

To recover damages from [defendant], [plaintiff] must prove that [he/she/it] would have obtained a better result if [defendant] had acted as a reasonably careful attorney.

(CACI 601.)  In cases involving malpractice by a lawyer purporting to be a specialist in some particular area of law, the plaintiff's burden is somewhat lighter.  "[A] lawyer holding himself out to the public and the profession as specializing in an area of the law must exercise the skill, prudence, and diligence exercised by other specialists of ordinary skill and capacity specializing in the same field."  *Wright v. Williams*, 47 Cal.App.3d 802, 810 (1975).

In California, as in most states, the matter of an attorney's liability for malpractice is determined by applying what is known as the "case within a case" (sometimes called "trial within a trial") method. That is, in a legal malpractice case, a client must prove by a preponderance of the evidence that, but for the negligence of the allegedly offending attorney, the client would have prevailed in the underlying claim, or that he has otherwise, because of the attorney's malpractice, suffered actual damages.  *See Ferguson v. Lieff, Cabraser, Hiemann & Bernstein, LLP*, 30 Cal.4th 1037, 1049 (2003). This can sometimes be a difficult question, inasmuch as the original case (the

10

case allegedly mishandled by the attorney who is a defendant in the second case) has generally been lost or never tried because of a procedural error, and the court in the malpractice action is left to determine what the proper result in the underlying case should have been.  Thus the plaintiff is generally required to demonstrate that his original, underlying case was meritorious and should have obtained a better result than he did but for the mishandling by his counsel in that case.

In this case, however, there is no hypothetical "case within a case" – there is only irrefutable fact.  There is no need for dueling experts to opine as to what result would or should have obtained absent Defendants' malfeasance. There is no need for a jury to determine what should have happened in the underlying case.  Here we *know* what would have happened, but for Defendants' malpractice. Here, we *know* that even after nearly two years of Cogan's ineptitude, malpractice, and breach of fiduciary duty by all Defendants, as soon as Cogan was replaced with competent successor counsel, Plaintiff's Patents issued forthwith.  Here we have ***conclusive proof*** of the merits of Plaintiff's patent applications, which were so badly mishandled by Defendants, and about which they consistently lied to or concealed facts from Plaintiff.

And, while *Wright* v. *Williams* suggests that expert testimony is required to determine the standard of care that should have been exercised by a specialist attorney accused of malpractice, even that issue is obviated in this case.  We do not need experts or a jury to determine the liability that is manifest here. The plain, incontestable facts tell us irrefutably that competent counsel could easily and expeditiously have obtained Plaintiff's Patents, because competent successor counsel in fact did.  Even following twenty months of substandard "work" on the Patent Applications by Cogan, when Plaintiff replaced Cogan with competent counsel the matter was fixed – the important and monetarily valuable Patents promptly issued.  As explained below, Defendant Cogan failed even to follow the most basic procedural standards set forth in the most basic text regarding patent prosecution.

In this case, Defendant Cogan spent twenty months and over $200,000 of Plaintiff's money "prosecuting" Plaintiff's Patent Applications at the PTO.  During this time, Cogan repeatedly assured Plaintiff's CEO, Matthew Klipstein, that the IP was "patentable," that he "believe[d]" Neurorepair had "patentable subject matter," that there was no need to "waste additional time of

11

yours with reassurances," and basically, that Neurorepair was close to obtaining the patents: "I cannot get a response out of the examiner before next month.  I really and truly believe *the patent application will be allowed.*"  (*See* Klipstein Decl., Exh. G, H, I.)  When the "final rejection" issued from the examiner, Cogan blamed the examiner, stating that she had taken a position that was "self-evident[ly]" wrong, based on "conjecture and fallacy," and "silly;" he explained that "while the examiner is invested in a silly position, her supervisor is not" and that he believed he could "get this allowed without an appeal," but that "if an appeal becomes necessary, we should be in a strong position." (Klipstein Decl. Exh. J.)  During this entire time, however, Cogan was misleading his client as to what was actually happening in the patent prosecutions while he failed to meet the minimum standard of competency.  For two years, he failed to do the single, simple, unexceptional and fundamental thing that, demonstrably, would have accomplished his client's goal.

The Fallon Applications had all been rejected by the PTO on two grounds.  First, the patent applications were initially rejected pursuant to 35 U.S.C. § 102, which provides, in relevant part:

> A person shall be entitled to a patent unless
>
> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

Reduced to its essence, 35 U.S.C. § 102 (commonly referred to as "novelty" or "anticipation") expresses the basic requirement that one's invention be new, and not something previously described in a patent or other published writing.

Second, the Patent Applications were initially rejected pursuant to 35 U.S.C. § 103(a) (generally referred to as "obviousness"), which provides:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Section 103(a), more simply stated, merely requires that, even if one's invention is not a duplicate of something previously described, it also may not be something that has been made

12

obvious by something previously described.  Both of these requirements are easily traversable where, as here, the Applications at issue do in fact represent a new, novel, and nonobvious invention.

The Manual of Patent Examining Procedure ("MPEP") is published by the PTO and is generally considered to be the most basic and authoritative resource for patent prosecutions.  "The MPEP [is] commonly relied upon as a guide to patent attorneys and patent examiners on procedural matters."  *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180 n.10 (Fed. Cir. 1995) (quoting *Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1439 (Fed. Cir. 1984)).  "While the MPEP does not have the force of law, it is entitled to judicial notice as an official interpretation of statutes or regulations as long as it is not in conflict therewith."  *Molins*, 48 F.3d at 1180 n.10.  A "reasonably careful" patent attorney would, at the very least, be fully familiar with the MPEP.  This is more elemental than a litigator knowing the basic Rules of Civil Procedure or the Rules of Evidence.

The MPEP clearly instructs the practitioner that a proper response to an anticipation or obviousness objection from the Examiner is evidence (generally a declaration), and that argument of counsel will not suffice. Even with these simple instructions from the PTO, Cogan failed to respond properly to the objections raised by he Examiner. Had Defendant Cogan followed the procedure prescribed by the relevant statutes and by the PTO itself, Neurorepair would have been spared great expense and years of anguish.

Specifically, MPEP § 716 directs the patent prosecutor's attention to 37 C.F.R. 1.132, which provides that:

> When any claim of an application or a patent under reexamination is rejected or objected to any evidence submitted to traverse the rejection or objection on a basis not otherwise provided for **must be by way of an oath or declaration** under this section.

37 C.F.R. 1.132 (emphasis added).[3]  MPEP§ 716.01(c)(II) further advises that "[t]he arguments of counsel cannot take the place of evidence in the record."  *Id.* (citing *In re Schulze*, 346 F.2d 600, 602, 145 USPQ 716, 718 (CCPA 1965)).  MPEP § 716.01(c)(II) further provides that

---

[3]  For the Court's convenience, relevant portions of the MPEP can be found at RJN 10.

"Examples of attorney statements which are not evidence and which **must be supported by an appropriate affidavit or declaration include statements regarding unexpected results** . . .

MPEP § 716.01(c)(II) (emphasis added).

This required no secret knowledge or exceptional expertise; it merely required an ordinary patent lawyer or non-lawyer patent agent to do what is commonly done, and, in fact, what the PTO literally instructs one to do. Because of Defendants' very effective concealment, however, Plaintiff never knew until years later when another attorney reviewed the files that Cogan was apparently unfamiliar with (or for another reason failed to comply with) even the most fundamental procedure of patent practice, and failed to do what would have been evident to any novice with only the most basic knowledge of patent prosecution.

Here, Haley knew what was required to "traverse the objections" of the PTO Examiner – a declaration setting forth the novelty and non-obviousness of the inventions. He met with Dr. Fallon, obtained his laboratory data, and submitted this **evidence** to the Examiner, who found it "persuasive." (*See* RJN 1-2.) The objections were thus easily overcome. Defendants could and should have done this four years earlier.

It does not take an expert to grasp that patent prosecution counsel's "argument" is not "evidence," and that "declaration" means a declaration of someone competent to testify to the facts. The plain language of the statute (35 C.F.R. 1.132) and the MPEP make clear that the Examiner's objections to the Neurorepair Applications could be overcome by "evidence" – by a simple Declaration of the Inventor (Fallon), someone associated with the inventor in the creation of the invention, or some other expert who could attest to the facts.

The MPEP directs an applicant to "submit a declaration," yet Cogan never did. Successor counsel, James Haley, did submit a Declaration of Dr. Fallon explaining the superiority of Fallon's invention over anything that had come before and the "unexpected results" obtained in Fallon's experiments. This declaration immediately convinced the examiner that Neurorepair's Patents should issue. (*See* Smegal Supplemental Expert Report, ¶¶ 13-15; RJN 5, 6; RJN 1, 2.)

In point of fact, the "Examiner's Statement of Reasons for Allowance" in both Allowances leading to Plaintiff's Patent #7,790,669B1 and Patent #7,795,202B2 specifically state that "**the**

14

**declaration** [of Dr. Fallon, submitted by Mr. Haley] under 37 CFR 1.132, filed on 5/11/10 **is**

**sufficient to overcome the rejection** under 35 USC 103(a) as being unpatentable over Weiss et al

…. **based on the unexpected results."** (RJN 1 - 2 (emphasis added).)

If the PTO publishes a manual that instructs counsel how to respond to a particular objection

made by a PTO Examiner to an Application, one would think it a matter of basic practice to follow

those instructions. Yet Defendant Cogan never did. Even after Cogan's repeated and seemingly

intransigent errors, Haley, retained by Neurorepair to replace Cogan, had no difficulty providing the

Examiner with precisely what she wanted, and, as a result, quickly obtained the desired patents.

**B.** **The Undisputed Facts Demonstrate That Defendants Are Liable for Breach of Fiduciary Duty**

The undisputed evidence also establishes that Defendants breached their fiduciary duties to

Neurorepair and that Neurorepair suffered damage as a result of that breach. Again, the amount of

such damage may be determined at trial.

"Breach of fiduciary duty [is] a concept which is separate and distinct from traditional

professional negligence but which still comprises legal malpractice." *Mosier v. Southern California*

*Physicians Ins. Exch.*, 63 Cal.App.4th 1022, 1044 (1998); *Slovensky v. Friedman*, 142 Cal.App.4th

1518, 1534 (2006) ("breach of fiduciary duty is a species of tort distinct from a cause of action for

professional negligence"). Not all legal malpractice equates to breach of fiduciary duty. However,

claims of negligence that implicate a duty of loyalty or confidentiality do support a cause of action

for fiduciary breach. *See* 2 Mallen & Smith, Legal Malpractice § 14:2, p. 586-87 (2007 ed.).

"The elements of a cause of action for breach of fiduciary duty are: (1) the existence of a

fiduciary duty; (2) the breach of that duty; and (3) damage proximately caused by that breach."

*Mosier*, 63 Cal.App.4th at 1044. Here, there is no question that Defendants were fiduciaries of

Neurorepair. "The relation between attorney and client is a fiduciary relation of the very highest

character, and binds the attorney to most conscientious fidelity – *uberrima fides*." *David Welch Co.*

*v. Erskine & Tulley*, 203 Cal.App.3d 884, 890 (1988).

There is also no question that Defendants owed Neurorepair duties of loyalty and

competence, as well as a duty to keep their client informed of significant developments in the case

15

and a duty not to conceal from their client material facts that might affect the outcome of the action. "The scope of an attorney's fiduciary duty may be determined as a matter of law based on the Rules of Professional Conduct which, 'together with statutes and general principles relating to other fiduciary relationships, all help define the duty component of the fiduciary duty which an attorney owes to his [or her] client.'" *Stanley v. Richmond*, 35 Cal.App.4th 1070, 1086 (1995) (quoting *Mirabito v. Liccardo*, 4 Cal.App.4th 41, 45 (1992)).  In this case, Defendants' misconduct indisputably violated both Cal. Rules of Prof. Conduct ("CRCP") 3-110 and CRCP 3-550 and breached Defendants' duty of loyalty to Neurorepair by failing to put Neurorepair's interests in obtaining competent legal services above their own interest in concealing Cogan's incompetence and in continuing to receive significant legal fees from Neurorepair.  Specifically, CRCP 3-110 provides:

> (A) A member shall not intentionally, recklessly, or repeatedly fail to perform legal services with competence. (B) For purposes of this rule, "competence" in any legal service shall mean to apply the 1) diligence, 2) learning and skill, and 3) mental, emotional, and physical ability reasonably necessary for the performance of such service. (C) If a member does not have sufficient learning and skill when the legal service is undertaken, the member may nonetheless perform such services competently by 1) associating with or, where appropriate, professionally consulting another lawyer reasonably believed to be competent, or 2) by acquiring sufficient learning and skill before performance is required.

In addition, CRCP 3-500 provides:

> Communication.

> A member shall keep a client reasonably informed about significant developments relating to the employment or representation, including promptly complying with reasonable requests for information and copies of significant documents when necessary to keep the client so informed.

CRCP 3-500.  The "Discussion" note to CRCP 3-500 states that "a client must be informed of significant developments in the matter."

In addition, false statements or material omissions by an attorney to a client clearly breach the attorney's fiduciary duties, particularly where those false statements and omissions further conflicting interests.  *See generally*, *Spector v. Mermelstein*, 485 F.2d 474, 479 (2d Cir. 1973) (classifying, as a "recognized basic principle," the rule that an attorney who "negligently or willfully withholds from his client information material to the client's decision to pursue a given course of

action, or to abstain therefrom, . . . is liable for the client's losses suffered as a result of action taken without benefit of the undisclosed material facts").  The fiduciary duty of undivided loyalty also means the lawyer cannot advance his own interests above those of his client.

There is no question that Defendants breached all of these fiduciary duties.  The undisputed evidence shows that both Cogan and the Nath Law Firm recognized that Cogan was not competent to handle the Neurorepair patent application prosecutions and needed to be replaced as the lead attorney on the file.  (*See* Clements Decl., Exh. A.)  This document indisputably demonstrates that several high-level members of the Nath Law Group, including its founder and senior-most member, Gary Nath, as well as managing partner Ross Epstein and attorney Susanne Hopkins, were for quite some time aware of Cogan's general incompetence and his specific malpractice respecting Neurorepair, yet neither Cogan nor any other representative of the Nath Law Group, ever advised Neurorepair of Cogan's obviously known deficiencies.[4]  Nor did Defendants rectify the problems. Instead, Defendants concealed from Neurorepair these material facts and continued to permit Cogan to provide Neurorepair with incompetent legal services, and to collect payment for those services. (Klipstein Decl., Exh. L; Clements Decl., Exh. G.)  Cogan's acknowledged lack of "sufficient learning and skill" to effectively prosecute the Neurorepair patent applications, the need for a competent attorney to take over the matter, and the fact that Neurorepair was, admittedly, not receiving any value for the significant legal fees it was paying to Defendants, was a "significant development" in the matter that needed to be communicated to Neurorepair.

### C.   The Undisputed Facts Demonstrate That Defendants' Malpractice and Breach of Fiduciary Duty Caused Plaintiff To Suffer Damage

Defendants' failure to prosecute Plaintiff's Patent Applications competently, and their fraudulent concealment of Defendant Cogan's gross malpractice, caused Neurorepair to obtain the Patents to which it was rightfully entitled at least four years later than should have been the case.

The Nath Law Group made no material progress in the two years it "worked on"

---

[4]  Notably, Cogan is no longer with the Nath firm. He has opened his own office, apparently as a sole practitioner, doing business under the name "Continuum Law."  (Klipstein Decl., ¶ 18 & Exh. M.)

17

Neurorepair's Patent Applications.  However, within just four months of the prosecutions being assigned to Ropes & Gray in April 2010, the Applications were allowed in August 2010.  The delay attributable to Defendants' malpractice and breach of fiduciary duty is significant and caused Plaintiff great monetary damage.

First, the Nath Law Group has admitted that Defendants overcharged Neurorepair for the work it performed.  (*See* Clements Decl., Exh. A [email dated 7/25/07 admitting that Neurorepair "has already spent more than $100,000 with us and has nothing to show for it."].)  There is no question that Defendants' own overbilling of Neurorepair has caused Neurorepair direct out-of-pocket damage and deprived Neurorepair of crucial capital to pursue enhancements of its inventions and the patenting of them.

Second, it is undisputed that Neurorepair paid subsequent counsel who took over the patent prosecution from Defendants a significant amount in attorneys' fees and costs.  (*See* Clements Decl., Exh. U.)  This resulted in a direct out of pocket loss to Neurorepair.  It also diverted time, effort and money to legal counsel and away from research and development for the next stage in the TGF-a development process.  (*Id*.)

Third, it is undisputed that the Patents that eventually issued in 2010 have a significantly shorter "life" than they would have had if Defendants were able to obtain them in 2006.  The period of patent protection runs, not from the granting of the Patent, but from the filing of the Patent Application.  *See* 35 U.S.C. § 154.  Therefore, time lost in the prosecution process is time lost from patent protection. Patent protection is an essential element in the valuation of novel biotechnology and the amount a potential acquirer will pay for that technology.  (*See* Lynch Expert Report, ¶ IV(3)(a); Burns Supplemental Expert Report, ¶ VI.)  Obviously, intellectual property with a longer period of patent protection is worth more than the same IP with less time of patent protection.  (*Id.*)

Fourth, it is undisputed that the delay in obtaining the patents has negatively impacted Neurorepair's ability to enter into a licensing deal.  Defendants' delay and mishandling of Neurorepair's Patent Applications kept Neurorepair's technology and methodology from the marketplace more than four years longer than should have been the case.  During that time there have been significant developments in the industry. (*See* Lynch ¶¶ IV(B),(C),(3)(a).)  Economic

18

conditions have deteriorated, and health care legislation that did not exist in 2006 will adversely affect Neurorepair's chances of entering into a licensing deal now, as opposed to four years ago. (*Id.*)

Thus, while the amount of damages is a matter to be determined by the jury, the fact of damage is beyond dispute.  Accordingly, Neurorepair's motion for summary adjudication of liability regarding malpractice and breach of fiduciary duty and of the fact of damage should be granted.

## MOTION TO STRIKE AFFIRMATIVE DEFENSES WITH PREJUDICE

### I.      PRELIMINARY STATEMENT

Defendants' Answer is a remarkable document.  It appears to include virtually every theoretical defense, in purely conclusory terms, one might find in a form book.  It recites twenty-seven "affirmative defenses," yet fails to allege a single fact that might support any of those defenses.

Because every one of Defendants' affirmative defenses fails on the same fundamental ground, it is unnecessary to address each of them separately.  The Court can and should strike Defendants' affirmative defenses with prejudice as defective under Fed.R.Civ.P. 8.

### II.      FACTUAL BACKGROUND

On May 27, 2009, Defendants filed an Answer to Neurorepair's complaint, asserting twenty-seven affirmative defenses.  (*See* RJN 12.)  Each of Defendants' affirmative defenses contains nothing more than labels and conclusions, and each fails to plead any facts sufficient to provide the plaintiff with "fair notice" of the defense.  For example,

• The First Affirmative Defense states:  "Defendants allege that Plaintiff, by its own acts and/or omissions, is estopped from recovering at all against Defendants."  However, there is no explanation of what those "acts and/or omissions" might be, or how they might work to "estop" Defendants from recovering in this action;

• The Second Affirmative Defense is the same as the first, with the meager distinction that Defendants' unspecified "acts and/or omissions" amount to a "waiver" instead of estoppel of their right to recover;

• The Fourth Affirmative Defense states that "said complaint, and each and every claim or purported claim contained therein, is barred by the applicable statute of limitations." However, Defendants fail to identify which statutes of limitations, to which claims such statutes might apply, what time has passed, or on what dates the statutes might have begun to

19

run or expired;

• The Sixth Affirmative Defense states that the complaint "is barred by the doctrines of res judicata and/or collateral estoppel," without providing even a hint of what prior action might give rise to such defenses or how these doctrines might apply here;

• The Twenty-Second Affirmative Defense is a contractual "catch all," alleging that "any duty of performance by Defendants is excused by reason of failure of consideration, waiver, breach of condition precedent, breach by plaintiff, impossibility of performance, prevention by plaintiff, frustration of purpose and/or acceptance by plaintiff."  Again, not a single fact is alleged to support these bald assertions, nor is there any explanation of how they might apply to this action;

• The Twenty-Third Affirmative Defense alleges that Plaintiff "lacks standing;"

• The Twenty-Fourth Affirmative Defense alleges that Plaintiff has "failed to name one or more indispensable (sic) parties," but fails to identify who the party or parties might be, or why they might be "indispensible" to the fair adjudication of this action;

• The Twenty-Seventh Affirmative Defense alleges that any amounts owed to Plaintiff "are off-set by amounts that Plaintiff owes Defendants for services rendered."

(RJN 12.)  These are but examples.  Even a cursory review of Defendants' Answer shows that each of the twenty-seven affirmative defenses is deficiently pled.

Having been provided with absolutely no factual or legal basis supporting any of the affirmative defenses, Neurorepair was forced to expend several of its valuable Special Interrogatories in an effort to obtain through discovery what should have been affirmatively plead in Defendants' Answer.  However, even Defendants' responses to the interrogatories did not provide a sufficient factual or legal basis for asserting any of their affirmative defenses.  (*See* Clements Decl., Exh. N.)

Accordingly, Plaintiff's counsel wrote to Defendants' counsel requesting an explanation of the defenses.  In return, Defendants' counsel flatly refused to cooperate or abide by the Federal Rules of Civil Procedure.  (*See* Clements Decl., ¶ 16 and Exh. O.)  Notably, Defendants' counsel admitted that Defendants had no factual evidence to support many of their affirmative defenses, yet still refused to withdraw them.  (*Id.*)[5]

---

[5]  This Motion is, admittedly, not made within 21 days of Defendants' defective Answer.  However, the reason is that Plaintiff's counsel attempted – twice – to resolve this matter without taking the Court's valuable time to hear a dispute intentionally generated by Defendants' counsel.  This motion is made expeditiously after those efforts failed due to Defendants' counsels' evident intention to make this lawsuit as long, tedious, and expensive, as possible.

### III.   ARGUMENT

Defendants' "affirmative defenses" are random, redundant, immaterial, defectively pled, and, in some instances, wholly fabricated.  Each of these "defenses" fails to meet the requirements of Fed.R.Civ.P. 8 and should be stricken.

### A.   Defendants' Affirmative Defenses Violate Fed.R.Civ.P. 8 And Should Be Stricken with Prejudice

Each of Defendants' twenty-seven affirmative defenses is wholly conclusory.  In not one of them do Defendants allege a single affirmative fact even purporting to contradict Plaintiff's substantive allegations.  This violates Fed.R.Civ.P. 8, which provides, in relevant part:

> (1) In General.  In responding to a pleading, a party must:
>
> > (A) state in short and plain terms its defenses to each claim asserted against it; and
>
> > (B) admit or deny the allegations asserted against it by an opposing party.
>
> (2) Denials — Responding to the Substance.  A denial must fairly respond to the substance of the allegation.

Fed.R.Civ.P. 8(b)(1) and (2).

In determining whether an affirmative defense is adequately pled, the Court should be guided by the plausibility standard set forth in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009).[6]  In *Twombly,* the Supreme Court explained that to prevail against a motion to dismiss, a plaintiff must plead sufficient facts to "state a claim to relief that is

---

[6]  Although the Ninth Circuit has not yet addressed whether the plausibility standard articulated in *Twombly* and *Iqbal* applies to the pleading of affirmative defenses, defendants respectfully submit that it should. Affirmative defenses are affirmative pleadings. The considerations of fairness, common sense and efficiency underlying *Twombly* and *Iqbal* mandate that the same pleading requirements apply equally to complaints and affirmative defenses.  "[I]t neither makes sense nor is it fair to require a plaintiff to provide the defendant with enough notice that there is a plausible, factual basis for her claim under one pleading standard and then permit a defendant under another pleading standard simply to suggest that some defense may possibly apply in the case."  *Palmer v. Oakdale Farms, Inc.,* 2010 WL 2605179, at *4 (W.D. Va.).  *See also CTF Dev., Inc. v. Penta Hospitality,* 2009 WL 3517617, at *7-8 (N.D. Cal.).  This is consistent with the well-established rule that although Fed.R.Civ.P. 8(c) governs the pleading of affirmative defenses, they are subject to the same Rule 8(a) pleading standards that apply to complaints.  *See Woodfield* v. *Bowman*, 193 F.3d 354, 362 (5th Cir. 1999).  "Affirmative defenses are pleadings and, therefore, are subject to all pleadings requirements of the Federal Rules of Civil Procedure."  *Heller Fin., Inc.* v. *Midwhey Powder Co.*, Inc., 883 F.2d 1286, 1294 (7th Cir. 1989).

plausible on its face."  550 U.S. at 570.  Under this plausibility standard, a complaint need not contain "detailed factual allegations"-but it must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* at 555.  In *Iqbal,* the Supreme Court further explained that "[a] claim has facial plausibility when the plaintiff pleads *factual content* that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S.Ct at 1949 (emphasis added).

Thus, an affirmative defense is legally insufficient if contains nothing more than labels and conclusions and fails to plead "factual content" sufficient to provide the plaintiff with "fair notice" of the defense.  *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979) ("The key to determining the sufficiency of pleading an affirmative defense is whether it gives plaintiff fair notice of the defense."); *Qarbon.com, Inc. v. eHelp Corp.*, 315 F.Supp.2d 1046, 1049 (N.D. Cal. 2004) (affirmative defenses are governed by the same pleading standard as complaints, and therefore must give plaintiff "fair notice" of the defense being advanced.).  Where an affirmative defense simply states a legal conclusion or theory without the support of facts explaining how it connects to the instant case, it is insufficient and will not withstand a motion to strike. *See Jones v. Community Redevelopment Agency*, 733 F.2d 646, 649 (9th Cir. 1984).  *See also Heller Fin., Inc.* v. *Midwhey Powder Co.*, Inc., 883 F.2d 1286 (7th Cir. 1989) ("The remaining defenses are equally meritless. They are nothing but *bare bones conclusory allegations.*  [Defendant] *omitted any short and plain statement of facts* and failed totally to allege the necessary elements of the alleged claims.") (emphasis added).

Accordingly, a number of federal courts, including courts in this district, have concluded that affirmative defenses such as those asserted by Defendants here are legally insufficient and should be stricken.  For example, in *Hayes v. Agilysys*, 2009 WL 891832, at *1-2 (N. D. Ill.), the court granted a motion to strike because "[d]efendant explicates each of the seven affirmative defenses with a single sentence conveying no information other than the name of the defense," further finding that:

> Bare bones is too thick a description for Defendants' remaining affirmative defenses. The Defendants' pleading is so insubstantial that there are no bones, for Defendants sketch out absolutely no detail to support their defenses and instead merely plaster the names of various affirmative defenses to the end of their Answer. This will not do, for neither the Court nor [Plaintiff] can divine the

22

slimmest of factual bases on which any of these defenses rest. *See, e.g., Davis*, 592 F. Supp.2d at 1058-59 (striking inadequately pleaded defenses of waiver and estoppel because court left to speculate as to which aspects of plaintiff's behavior formed basis of defense). *Id.* at *2.

In this case, Defendants' affirmative defenses – including, but not limited to, waiver, estoppel, unclean hands, the statute of limitations, and lack of standing – are wholly conclusory, alleging nothing more than the name of a legal theory that (as Defendants' counsel have admitted) may not even apply to the case at bar.  Pleadings such has these are routinely stricken.  For example, in *Shechter* v. *Comptroller Of City Of New York*, 79 F.3d 265 (2nd Cir. 1996), the Court criticized "bald assertion" affirmative defenses – such as the ones alleged in Defendants' Answer here – as being improperly pleaded:

> "Affirmative '[d]efenses which amount to nothing more than mere conclusions of law and are not warranted by any asserted facts have no efficacy.'"

*Id.* at 270 (emphasis added).  *See also Woodfield v. Nationwide Mutual Ins. Co.*, 193 F.3d 354, 362 (5th Cir. 1999) (baldly "naming" the broad affirmative defense of "waiver and/or release" falls well short of the minimum particulars needed to identify the affirmative defense and provide "fair notice"); *Ariosta v. Fallbrook Union High School Dist.*, 2009 WL 1604569, at *8 (S.D. Cal.) (striking several affirmative defenses, including one based on the statute of limitations because it was based on an unspecified statute and did not identify the causes of action allegedly barred by the statute); *Servpro Industries, Inc. v. Schmidt*, 905 F. Supp. 475, 482 (N.D. Ill. 1995) (striking affirmative defenses that "provide no information other than the name of the legal theory on which each affirmative defense is based (*e.g.*, waiver, estoppel, illegality)").

Defendants' 26th and 27th affirmative defenses, entitled "Additional Defenses" and "Right to Amend Answer," are improper.  An attempt to reserve affirmative defenses for a future date is not a proper affirmative defense in itself. *See Reis Robotics USA, Inc. v. Concept Indus., Inc.*, 462 F.Supp.2d 897, 907 (N.D. Ill. 2006).  Instead, if at some later date Defendants seek to add affirmative defenses, they must comply with Fed.R.Civ.P. 15. Defendants cannot avoid the requirements of Rule 15 simply by "reserving the right to amend or supplement their affirmative defenses."  As Judge William Hibbler explained in *Hayes* v. *Agilysys*:

In Defendants' seventh proposed affirmative defense, they purport to "reserve the

23

right to assert additional defenses as they become known." The Federal Rules of Civil Procedure contain a provision under which parties may amend their pleadings, Rule 15, which covers amendments before and after trial. *See* Fed. R. Civ. P. 15. The Defendants cannot simply abrogate the Rules of Federal Procedure and hold the Court hostage to their inclination to later amend their pleading. If the Defendants desire to add another affirmative defense, they may seek leave from the Court to do so, but the Court will strike Defendants' seventh affirmative defense with prejudice. *See Reis Robotics USA, Inc. v. Concept Indus.*, 462 F.Supp.2d 897, 907 (N.D. 111. 2006).

*Agilysys*, 2009 WL 891832, at *2.

Finally, it should again be noted that with respect to many of their affirmative defenses, Defendants have admitted that, at the time they were asserted (and later, when responding to special interrogatories) they had no facts to support them.  Instead, according to Defendants' counsel, affirmative defenses such as standing and unclean hands were asserted "to protect [their] rights in the event that information is uncovered to support [the] defense."  (Clements Decl., Exh. O.) Moreover, despite being given two additional chances by Plaintiff's counsel to explain these "defenses," Defendants' counsel have steadfastly refused to do so. (*Id.*)

The assertion of numerous unsupported affirmative defenses has long been disapproved by the courts. As Judge Robert Bell of the Western District of Michigan wrote in *Glover* v. *Elliott*, 2007 WL 2904050 (W.D. Mich.):

> Defendant's answer in the present case appears especially vulnerable to a motion to strike. In a simple lawsuit involving a single collection letter, defendant has alleged eighteen separate affirmative defenses. This method of pleading everything, "including the kitchen sink," displays a lack of care, deliberation, and professionalism on the part of counsel engaging in such conduct.

*Id.* at *2.  The same is true here.

**B.     Justice Requires That the Affirmative Defenses be Stricken With Prejudice**

The function of a Rule 12(f) motion to strike is to avoid the expenditure of time, money and judicial resources that will arise from litigating spurious issues by dispensing with those issues prior to trial.  *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1993).  Often, if the court chooses to strike a defense, leave to amend is given.  However, that general rule applies only where there has been no prejudice to the opposing party.  *See Qarbon.com,* 315 F.Supp.2d at 1049.

Here, Neurorepair has been forced to prosecute this action without knowing whether there is, in fact, a factual or legal basis for the myriad of affirmative defenses plead by Defendants.

24

Defendants' initial pleading provided Neurorepair with no factual information upon which to assess the validity of the defenses, and its discovery regarding these defenses elicited no more useful information.  Neurorepair is now engaged in dispositive motion practice, and is preparing its case for trial, without knowing exactly which affirmative defenses Defendants believe actually apply in this action, or what the factual or legal basis for any such defenses might be.  Under these circumstances, it is respectfully submitted that the affirmative defenses should be stricken with prejudice.

## IV.    CONCLUSION

For all of the foregoing reasons, Plaintiff Neurorepair respectfully requests that its Motion for Summary Adjudication Re: Liability and the Fact of Damage be granted, and that all of Defendants' affirmative defenses be stricken with prejudice.

Dated:  November 2, 2010                  KRIEG, KELLER, SLOAN, REILLEY & ROMAN LLP



By: _____/s/_____
        KENNETH E. KELLER
        Attorneys for Plaintiff NEUROREPAIR, INC.